IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| RANDALL N. MARTIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Cause No. 2:22-CV-226-PPS-APR |
| vs. ) | |
| ) | |
| ROBERT A. GOLDSMITH, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Randall Martin, a former Sheriff's Deputy who was facing disciplinary proceedings, decided on the eve of his evidentiary hearing to enter into an agreement to resolve his employment status. In exchange for having the charges dropped, Martin resigned and entered a mutual release and covenant not to sue. However, soon thereafter, Martin became disgruntled when the state disclosed *Brady/Giglio* information, disseminating it in criminal in cases where Martin was a witness, as well as the Tippecanoe County Bar writ large, and to the towns of Dayton and Flora where Martin hoped to continue his career in law enforcement.

Martin has sued several defendants which have sorted themselves into two distinct groups: Tippecanoe County Sheriff Robert A. Goldsmith and the Board of Commissioners of Tippecanoe County, Indiana ("Tippecanoe County Defendants"); and Patrick Harrington, Jason Biss, and the State of Indiana ("State Defendants"). Both groups seek dismissal of the complaint. [DE 15, 17.] Because I find Defendants are

shielded by immunity and Martin has not sufficiently alleged a deprivation of due process, the federal claims will be dismissed with prejudice, and I will relinquish jurisdiction over the supplemental state law claims.

**Background**

Let's start by introducing the cast of characters: Plaintiff, Randall Martin, was a lieutenant in the Tippecanoe County Sheriff's Office. [Compl., DE 1, at 1-2.] He had worked there for 14-years. [*Id.* at 2.] The defendants are Patrick Harrington (the elected Prosecutor of Tippecanoe County), Jason Biss (Harrington's Chief Deputy Prosecutor), and Sheriff Robert Goldsmith. Goldsmith was elected Sheriff of Tippecanoe County in November 2018 and he took office in January 2019. During Goldsmith's campaign, Martin filed department complaints against several Tippecanoe County Sheriff Officers for campaigning on behalf of Goldsmith while on duty and in uniform. *Id.* Martin believes that Goldsmith retaliated against him by subjecting him to a trumped up internal affairs investigation. *Id.*

In the fall of 2020, Martin was placed under internal investigation relating to his involvement in an arrest of two people. *Id.* According to the State's *Brady/Giglio* disclosure, the initial stages of the investigation determined that Martin used unnecessary force by spraying two people in the face with oleoresin capsicum; he used unnecessary force by tasing the two people who did not show active physical resistance toward Martin; inconsistences were discovered between Martin's report and review of the body camera footage; and Martin accessed unrelated footage from the body camera

2

online system on multiple occasions for personal reasons without appropriate department authorization. [Disclosure, Ex. B to Compl., DE 1-2.]  As a result of these determinations, Martin was suspended. [DE 1 at 5.]

For his part, Martin vehemently disagrees with these determinations, and claims the people he arrested were drunk and belligerent. [DE 44 at 3 n.1.] Consequently, Martin requested a public hearing before the Merit Board, and one was set for April 29 and 30, 2021. [DE 1 at 6-7.] A few weeks before the hearing, Goldsmith, supposedly in collaboration with the prosecutors (Harrington and Biss), referred the investigation to a special prosecutor to investigate any criminal charges against Martin. [DE 1 at 7.]

On the eve of the hearing, April 28, 2021, Martin entered into an Agreement to Resolve Employment Status. [Agreement attached to Compl. as Ex. A.]  In a nutshell, Martin agreed to resign if the allegations of misconduct against him were withdrawn (prior to any special prosecutor finding), and Goldsmith agreed to withdraw the misconduct charges against Martin in exchange for his resignation. [DE 1 at 7-8.] The agreement included a mutual release and covenant not to sue by both the Sheriff and Martin. [DE 1-1 at 2.] Pursuant to the agreement, Martin's resignation from the Sheriff's Department was effective on May 3, 2021. [*Id.* at 1.]

Just a few days later, on May 11, 2021, the State of Indiana filed the "State's Disclosure of Brady/Giglio Information" in Cause 79D06-1904-F6-516.[1] [Compl. Ex. B,

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), require government disclosure of impeaching or exculpatory material.

3

DE 1-2.] That document lists the information contained in Goldsmith's charging notice that gave rise to the misconduct investigation against Martin. [Compl. at 9.] Martin alleges defendants Goldsmith, Harrington and Biss "conspired" to draft and publish the *Brady-Giglio* disclosure so that Martin didn't learn of it before resigning. *Id.* The same day his resignation was effected, the disclosure was disseminated by Defendants to the members of the Tippecanoe County Bar. *Id.* In addition, the disclosure was filed as a matter of public record in dozens of cases that Martin was involved in the arrest. *Id.* Martin alleges that the Defendants also directly told his part-time employer of eight years, the Town of Dayton, Indiana, the contents of the disclosure. *Id.*

Martin claims that as a result of the disclosure and representations from the Defendants, the town of Dayton declined to hire Martin in a full-time capacity and, despite his years of service and expectation of employment with them, suspended Martin from his part-time job with Dayton. [DE 1 at 11.] Martin was also rejected by the town of Flora for employment. *Id.*

The complaint states nine causes of action but only one federal claim based on the due process clause. The other claims are a variety of supplemental state law causes of action. Martin wants both monetary and equitable relief (namely rescinding the *Brady-Giglio* disclosure). [DE 1.] Both sets of defendants have moved to dismiss the complaint in its entirety. [DE 15, 17.]

## Discussion

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While I must accept all factual allegations as true and draw all reasonable inferences in the complainant's favor, I don't need to accept threadbare legal conclusions supported by purely conclusory statements. *See Iqbal*, 556 U.S. at 678. Martin must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Making the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

I. **The Federal Claim Against State Defendants (Harrington, Biss, State of Indiana)**

Amidst a sea of state law claims, Martin brings just one claim based on federal law. Count Eight is for deprivation of procedural due process pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment. [DE 1 at 20-21.] Martin claims Goldsmith reconfigured the composition of the Merit Board to reach a negative conclusion about him, publicly released misleading and defamatory information, and pressured Martin into resigning and foregoing his right to a hearing. [DE 1 at 20.] He alleges he had a property interest in his employment which could not be deprived without procedural due process.

Although the State Defendants first argue that the Eleventh Amendment bars the federal claim against them in their official capacities, because immunity is dispositive in

5

this case, and in an effort to avoid making constitutional decisions when possible, *see ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2010), I will turn to that issue instead.

State Defendants Biss and Harrington (the prosecutors) contend they are absolutely immune from the Section 1983 claim because their actions were taken in furtherance of their prosecutorial duties. [DE 18 at 6.] In response, Martin argues that while a prosecutor may be immune for his direct role in conducting a trial, because he was never a criminal defendant, the actions of the State Defendants don't qualify for prosecutorial immunity. [DE 45 at 6-7.] As the officials seeking absolute immunity, Biss and Harrington bear the burden of showing immunity is justified for the functions at issue. *Burns v. Reed*, 500 U.S. 478, 486 (1991).

Prosecutors are entitled to absolute immunity for acts taken within the scope of their prosecutorial roles. *Greenpoint Tactical Income Fund LLC v. Pettigrew*, 38 F.4th 555, 565-66 (7th Cir. 2022). Prosecutors are absolutely immune, both individually and in their official capacities, from liability under section 1983 for evaluating evidence, initiating a prosecution, and presenting the State's case. *Imbler v. Pachtman*, 424 U.S. 409, 422-428 (1976).

Martin can't escape this type of immunity merely by saying because he was not a criminal defendant, this type of immunity cannot apply. It isn't that simple. Prosecutorial immunity is broader than that — it extends to "conduct that is functionally prosecutorial; this immunity is understood to broadly cover all conduct

associated with the judicial phase of the criminal process." *Bianchi v. McQueen*, 818 F.3d 309, 316 (7th Cir. 2016). In determining whether a prosecutor's acts were performed in furtherance of his prosecutorial duties, federal courts apply a functional approach, looking at "the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 259-60 (1993); *see also Imbler*, 424 U.S. at 430. The Supreme Court has explained that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Buckley*, 509 U.S. at 272 (quotation omitted).

It's hard to conceive of a more core prosecutorial function than meeting ones duty of disclosure under *Brady/Giglio*. It is not surprising therefore that the Seventh Circuit has held that "*Brady* and *Giglio* duties are functionally prosecutorial – they are intimately related to the judicial phase of the criminal process." *Fields v. Wharrie*, 672 F.3d 505, 513 (7th Cir. 2012). In fulfilling these *Brady/Giglio* obligations, prosecutors act as officers of the court "embroiled in the judicial phase of the criminal process" and are entitled to immunity with respect to their "actions and decisions pertaining to [the] fulfillment of *Brady* and *Giglio*." *Id.* In other words, "absolute immunity applies to a prosecutor's decisions about evidence and her implementation of her *Brady* responsibilities." *Whitlock v. Brueggemann*, 682 F.3d 567, 579 (7th Cir. 2012).

The act of creating the *Brady/Giglio* disclosure and sharing it in cases where Martin was involved in the arrest is plainly a prosecutorial duty, and is easily entitled to absolute immunity. This is an obligation of the State Defendants — a kind of

7

administrative obligation that is the type that should clearly be protected by absolute immunity. Harrington was acting as a prosecutor at the time he obtained this information and it was obviously pertinent to upcoming trials. Martin could very well be a testifying witness at trial, and people, like Biss, needed to evaluate the credibility of his testimony. *See Savage v. Maryland*, 896 F.3d 260, 271 (4th Cir. 2018) ("[A] prosecutor's professional evaluation of a witness is entitled to absolute immunity even if that judgment is harsh, unfair or clouded by personal animus, as [the officer] alleges here.").

But I am a little less sure about how to handle the disclosure to members of the Tippecanoe County Bar, and to Martin's part-time employer, the Town of Dayton, as well as the town of Flora. This strikes me as a little different kettle of fish. The State Defendants continue to argue this dissemination "all occurred within the scope of the State Defendants' prosecutorial duties and thus are prosecutorial in nature." [DE 18 at 8.] But I'm not so sure. Let's consider each of these situations in turn.

As to the sharing with the bar association after the *Brady/Giglio* disclosure was filed in specific cases involving Martin, the State Defendants argue that this was also a prosecutorial function, intimately connected with evaluation of witnesses and preparation for trial. [DE 18 at 11.] In conducting this analysis, let me start by saying we are dealing with an odd ball fact situation. Most cases involving prosecutorial misconduct surrounding *Brady/Giglio* disclosures involve criminal defendants heading to trial, and the main issue is usually whether the state disclosed all of the proper

8

information to which the defendant was entitled. This case turns that scenario on its head. Here, Martin is complaining that the State has improperly disclosed *too much* information about him.

Although it is far from identical to this factual scenario, one case that seems helpful to this analysis is *Savage,* where the Fourth Circuit looked at a police officer's claim that it was improper to prohibit him from testifying on any case he investigated after the prosecutor determined his potential testimony was not credible. 896 F.3d at 270. The Court reasoned:

> Decisions regarding witness testimony – which witnesses to call, whether potential witnesses are credible, and how to proceed in the face of credibility questions – are a core prosecutorial function, directly tied to the conduct of a criminal trial. This is clear from *Imbler* itself, holding that prosecutors are absolutely immune from claims that they knowingly presented false testimony at trial: Because "[t]he veracity of witnesses in criminal cases frequently is subject to doubt," the Court explained, the integrity of the criminal process would suffer if "prosecutors were hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability." *Imbler*, 424 U.S. at 426. Instead, decisions about "which witnesses to call" are among the "sensitive issues" that prosecutors must address in their capacity as advocates as they prepare for trial, fully shielded by immunity. *Id.* at 430 n. 33.

*Savage*, 896 F.3d at 270.

Savage argued that by refusing to call him as a witness or prosecute his cases, the state "effectively made it impossible for him to do his job," and contended that absolute immunity wasn't available to the prosecutors because they were making administrative decisions. *Id.* at 272. The Fourth Circuit totally rejected his argument, reasoning:

9

> We cannot agree. That a judgment about witness credibility or which cases to try has negative employment consequences – even readily foreseeable ones – does not change the underlying nature of that judgment; the immunity analysis focuses on the prosecutorial conduct in question, and "not on the harm that the conduct may have caused." *Buckley*, 509 U.S. at 271. Nor does the effect on Savage's career do anything to distinguish this case from all the others, discussed above, in which courts apply absolute immunity when police officers lose their jobs or suffer other adverse actions because their employers are informed by prosecutors that they no longer will be used as witnesses. *See, e.g., Roe*, 109 F.3d at 582; *Barnett*, 16 F.Supp.3d at 1221, 1223.

*Savage*, 896 F.3d at 272. Furthermore, the Court acknowledged that even though some functions that the defendant prosecutors engaged in were administrative like training, supervision, and information-systems management, because they also were "directly connected with the conduct of a trial" and required the exercise of legal discretion, they remained protected by absolute immunity. *Id.* at 273.

The State Defendants also cite several cases from the Ninth Circuit holding that "prosecutors who made the decision to place officers on [Brady] lists and communicated those decisions were entitled to absolute immunity." *Adamson v. Pierce Cnty.*, 3:21-cv-5592-DGE, 2022 WL 1667016, at *4 (W. Dist. Wash. May 25, 2022). The facts in *Adamson* resonate as similar to this case. There, the court found,

> Considering the facts in the light most favorable to Plaintiffs, Schacht put Plaintiffs on the *Brady* list based on information that did not qualify as PIE [potential impeachment evidence]. Rather, Schacht was motivated to investigate and keep Plaintiffs on the *Brady* list because he held hostile animus towards Plaintiffs for speaking out against PCPAO's [Pierce County Prosecuting Attorney's Office] alleged interference and supporting an opposing candidate for Sheriff. Nonetheless, maintaining a *Brady* list is part of a prosecutor's core role in the judicial process and, therefore,

10

carries absolute immunity.

*Id.  See also Neri v. Cnty. of Stanislaus Dist. Attorney's Office*, No. 1:10-cv-823-AWI GSA, 2010 WL 3582575, at *8 (E.D. Cal. Sept. 9, 2010) (finding placing name on a *Brady* list and disclosing *Brady* materials were done in a prosecutorial capacity because "disclosing what the district attorney considered to be Brady Material, and not utilizing objective criteria for Brady List determinations is conduct that requires witness evaluation, involves obligations imposed pursuant to the Supreme Court (*Brady v. Maryland*), requires the application of legal knowledge, and is associated with the judicial phase of the criminal process.").  Similarly, in *San Agustin*, the plaintiff alleged certain state actors conspired to purposefully have his name placed on a *Brady* list and disclose that information, but the court found that conduct was directly connected to the judicial phase of the criminal process and protected by absolute immunity.  *San Agustin v. El Paso Cnty.*, No. 18-cv-02646-MEH, 2019 WL 4059167, at *16-17 (D. Colo. Aug. 28, 2019).  The *San Agustin* court reached this conclusion, despite the plaintiff's protestations that having his name on the *Brady* List is commonly considered to be a "career killer."  *Id.* at *17.

      I do think that sharing the disclosure with the bar association is akin to the actions in *Savage, Adamson*, and the district court cases cited above, and still qualifies as actions intimately associated with the prosecutor's duty.  Presumably this information was shared so that other members of the legal community — prosecutors and defense lawyers alike — could better determine whether to use Martin in trials, and weigh the

11

credibility of any future testimony he might give.

And I suppose this rationale also supports absolute immunity for sharing this information with Martin's part-time employer, the town of Dayton, and the town of Flora, but to a lesser degree. Directly sharing this information with a current or potential employer seems even one more step removed from a purely prosecutorial function.

But let's assume that the direct dissemination of the *Brady/Giglio* disclosure to the two towns that Martin hoped to work for was not a purely prosecutorial action protected by absolute immunity; what about qualified immunity? "If a prosecutor's function was quas-judicial, the prosecutor enjoys absolute immunity. If the function was administrative or investigatory, the prosecutor enjoys only qualified immunity." *Patterson v. Burge*, 328 F.Supp. 2d 878, 892 (N.D. Ill. 2004) (quotation marks and citation omitted).

Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Hernandez v. Mesa*, 137 S.Ct. 2003, 2007 (2017) (quotation and citations omitted). "The doctrine of qualified immunity balances dueling interests – allowing officials to perform their duties reasonably without fear of liability on the one hand and affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices on the other." *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 987 (7th Cir. 2021 (quotation marks and citation omitted).

12

"The purpose of qualified immunity is to protect all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998) (quotation omitted).

Qualified immunity is an affirmative defense, but once properly raised by a defendant, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). In determining whether qualified immunity applies, courts engage in a two-pronged inquiry. *Id.* First, the court asks whether the facts, taken in the light most favorable to the injured party, show that the officer's conduct violated a federal right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court asks whether the constitutional right was clearly established at the time of the challenged conduct. *Id.* Courts may pick and choose which prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, it is evident the constitutional right was not clearly established at the time of the challenged conduct. In this regard, Martin's argument is entirely self-defeating: he tells me in his brief that "Martin's circumstance is, above all, novel." [DE 45 at 7.] And it is true, as I mentioned before, that most of the caselaw on this subject involves civil claims by criminal defendants regarding some aspect of the manner their criminal cases were prosecuted. There is a dearth of law on point about the present situation, where a *Brady/Giglio* disclosure is shared with multiple entities after a police officer voluntarily resigned his position to bring an investigation to a close. There is simply no caselaw holding the disclosures in this case violate a police officer's clearly established

13

constitutional right to be free from being subject to a disclosure disseminated to the local bar association or his employer. As such, even if these actions are not protected by absolute immunity, I am confident they are entitled to qualified immunity.

Finally, before moving on to the other motion to dismiss, it's also worth dipping my toe into the merits. I note that Martin has not shown that he was deprived of a protected property interest, in contravention of due process. Martin claims "he was deprived of his continued employment, as well as future employment opportunities." [DE 44 at 10.] But, as I explain more in the next section of this order, I'm not sure how he can characterize what happened to him as a "deprivation" since he voluntarily resigned. Moreover, the State Defendants (the Prosecutor and Chief Deputy Prosecutor of Tippecanoe County) aren't Martin's actual employer, so I can't see how he has stated a due process claim against them under Section 1983 or the Fourteenth Amendment. Therefore, the federal claim against the State Defendants should be dismissed.

## II. The Federal Claim Against County Defendants (Sheriff Goldsmith and Board of Commissioners of Tippecanoe County)

In turning to the sole federal claim for deprivation of due process as alleged against the County Defendants, it is easy to reach the conclusion that Martin has not sufficiently alleged a deprivation of due process.

A claim for violation of procedural due process under section 1983 requires pleading of (1) the existence of a cognizable property interest; (2) deprivation of that interest; and (3) a denial of due process. *Licari v. City of Chicago*, 298 F.3d 664, 668 (7th Cir. 2002). The Fourteenth Amendment's due process clause is not absolute – in other

words, it does not prohibit deprivations of liberty or property altogether – it just requires that individuals receive "due process" when such deprivations occur. U.S. Const. Amend. XIV, § 1; *Parratt v. Taylor*, 451 U.S. 527, 537 (1981), *overruled on other grounds* by *Daniels v. Williams*, 474 U.S. 327 (1986) ("Nothing in [the Fourteenth] Amendment protects against all deprivations of life, liberty, or property by the State. The Fourteenth Amendment protects only against deprivations 'without due process of law.'").

While it is true that procedural due process protections are afforded to deputies because they have a property interest at stake in their job, *see* Ind. Code § 36-8-10-11(a), even the case cited by Martin finds that "the extent of process required is 'notice and opportunity for hearing appropriate to the nature of the case.'" *Marion Cnty. Sheriff's Merit Bd. v. Peoples Broadcasting Corp.*, 547 N.E.2d 235, 239 (Ind. 1989) (quoting *Bd. Of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 n.7 (1972)). It is unquestionably true that Martin had notice in this case, and an opportunity for a hearing – indeed, the Merit Board hearing was set and on the calendar. The fact that Martin voluntarily choose to waive the hearing, and instead entered into an agreement to resolve his employment status which explicitly withdrew his request for a hearing in exchange for the Sheriff accepting Martin's resignation and withdrawing the charges pending before the Merit Board [DE 1-1 at 1], dooms his claim for deprivation of due process. As such, the federal claim against the County Defendants also requires dismissal.

**III.     The State Law Claims**

Martin has also alleged state law claims for fraudulent inducement (Count One), conspiracy, collusion and corruption (Count Two), state law abuse of process (Count Three), breach of contract (Count Four), defamation (Count Five), tortious interference with business relationship (Count Six), invasion of privacy - false light (Count Seven), and state law agency (Count Nine).  The Court has granted dismissal in favor of Defendants on Martin's only federal claim, which was the sole basis for federal jurisdiction in this action as the parties are not diverse. [DE 1 at 11-12.]

Martin also alleges in the complaint that this Court has federal jurisdiction based on the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. [DE 1 at 11-12.] However, the Declaratory Judgment Act does not actually confer federal jurisdiction. 28 U.S.C. § 2201(a).  It only permits declaratory relief when an independent basis for federal subject matter jurisdiction exists.  *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950); *TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 634 (7th Cir. 2003) (noting that the Declaratory Judgment Act "does not and cannot serve as an independent basis for federal jurisdiction.").  Therefore, the Court must decide whether to exercise supplemental jurisdiction over Martin's remaining state law claims.

Upon due consideration, the state law claims are dismissed without prejudice because the federal claim has been dismissed prior to trial.  28 U.S.C. § 1367(c)(3); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims

16

whenever all federal claims have been dismissed prior to trial."); *see also Williams v. Fort Wayne Police Dep't Officers John/Jane Does*, No. 1:12-CV-202, 2012 WL 6727534, at *3 (N.D. Ind. Dec. 27, 2012).

## Conclusion

For all of the above-mentioned reasons, the Tippecanoe County Defendants' Motion to Dismiss [DE 15] and the State Defendants' Motion to Dismiss [DE 17] are both GRANTED: the federal claim (Count 8) is DISMISSED WITH PREJUDICE and the state claims (Counts 1-7, and 9) are DISMISSED WITHOUT PREJUDICE. The Clerk is ORDERED to CLOSE this case.

**SO ORDERED**.

ENTERED: May 30, 2023

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT